**SO ORDERED.**

**SIGNED this 6th day of December, 2013.**



Dale L. Somers
United States Bankruptcy Judge

_____

Opinion designated for publication
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

In re:

**REX V. YOUNGQUIST,**

                        **DEBTOR.**

**CASE NO. 11-10135**
**CHAPTER 7**

**MEMORANDUM OPINION AND ORDER**
**DETERMINING THE BANKRUPTCY ESTATE'S OBLIGATION FOR**
**MANAGEMENT FEES AND EXPENSES THROUGH FEBRUARY 28, 2013**

Throughout this Chapter 7 case, Bill Fair & Co. (BFC) has managed real

properties owned by Debtor. The amount owed by the estate to BFC as management fees

and for expenses is a contested issue, which has been the subject of three days of trial,

begun on May 22 and 23, 2013,[1] and concluded on September 18, 2013.[2]

_____

[1] The Trustee, J. Michael Morris, appeared by J. Michael Morris of Klenda Austerman LLC.
Receiver Peter Pratt appeared by Thomas J. Lasater of Fleeson, Gooing, Coulson & Kitch, L.L.C. Bill
Fair & Co. appeared by Paul D. Sinclair of Polsinelli PC. Gail Youngquist appeared pro se. Debtor did
not appear.

[2] The appearances were the same as at the May trial with the exception that Debtor and Gail
Youngquist were represented by Ira Dennis Hawver.

The controversy arises in the context of a confluence of unfortunate circumstances. Debtor owned three real properties in Douglas County, Kansas. They are known as Villa 26 Apartments, Four Wheel Drive, and the North Lawrence Real Estate. A judgment against Debtor and his daughter, Gail Youngquist, entered in Texas, was registered in Douglas County, Kansas District Court. By an Order of Sale, BFC was appointed by that court to manage the three properties and to conduct an auction sale of Villa 26 Apartments and Four Wheel Drive.

In response to the registration of the Texas judgment, the Order of Sale, and the appointment of BFC, but before the properties were ready for sale, Debtor, an elderly man who appears to be incapable of meaningful participation in these proceedings, filed this case under Chapter 7 of the Bankruptcy Code pro se in Wichita, Kansas. In all likelihood, if Debtor had consulted with counsel, he would have been advised that a Chapter 7 proceeding would not be beneficial. Debtor's daughter, Gail Youngquist, who is also subject to the Texas judgment (although she contends it was entered against her by default without jurisdiction), was a co-owner of Villa 26 Apartments. Until very recently, she also appeared pro se and did not effectively represent her interests.

The Chapter 7 Trustee, who has no experience managing large apartment complexes, obtained Court approval for the employment of BFC as manager and auctioneer for the three Douglas County properties. But BFC also had no experience managing apartment complexes, large or small, on a long-term basis. Further, BFC has no familiarity with bankruptcy proceedings and received no guidance from the Trustee.

2

In large part because of objections to the Trustee's proposed sale of Villa 26 Apartments, the management phase of BFC's employment has lasted over two years, during which time the Trustee, who is located in Wichita, approximately 150 miles from Lawrence, failed to inspect the properties under management or to demand and receive payments, accountings, or management updates from BFC. Neither Debtor nor his daughter were capable of cooperating with BFC. After the auction sale of Villa 26 Apartments, BFC requested from the Trustee compensation for its management services and expenses under the management contracts approved by the Douglas County, Kansas District Court and by this Court.

The issue of the compensation due BFC for management fees and expenses is presented to the Court by the following pleadings: Application to Determine Accounting and Fees of Property Manager, through February 28, 2013, filed by Trustee J. Michael Morris;[3] First Application for Payment of Reasonable Compensation for Services Rendered and Costs and Expenses Incurred Pursuant to 11 U.S.C. § 543(C)(2) from the Petition Date to June 8, 2011, filed by BFC;[4] and Second Application for Payment of Reasonable Compensation for Services Rendered and Costs and Expenses Incurred Pursuant to 11 U.S.C. §§ 328, 330 and 331 and Federal Rule of Bankruptcy Procedure 2016, from June 9, 2011 to February 28, 2013, filed by BFC. [5] Responses were filed to

---

[3] Dkt. 194.

[4] Dkt. 232.

[5] Dkt. 233.

3

these pleadings. Although the Court's consideration of the case has revealed several procedural irregularities and the Court has suggested to the parties that those matters could impact resolution of this controversy, counsel have not pursued them. Therefore, the Court will address the compensation issue only within the framework presented by the parties. In doing so, it will not make distinctions between the Trustee's application and BFC's applications since they address the same matters, although from different perspectives. The burden of proof is on BFC to show it is entitled to the compensation requested.[6]

## BACKGROUND FACTS.

On February 18, 2010, the District Court of Travis County, Texas, 126th Judicial District, awarded a judgment in favor of the State of Texas against Rollover Lease Operations, Inc., Gail S. Youngquist (by default), Rex A. Youngquist (on the plaintiff's motion for summary judgment following a pro se written response to the complaint), and Greggory Clinton Sander, jointly and severally, in the total amount of $848,739.00, plus interest and costs.[7] On March 23, 2010, the same court appointed Peter E. Pratt, Jr., as a receiver with "the fullest authority under Texas Law to seize all non-exempt property" of the judgment defendants and to pay the proceeds to the plaintiff to satisfy the judgment.[8]

---

[6] *In re Sevitski,* 161 B.R. 847, 854 (Bankr. N.D. Okl. 1993) (receiver seeking fees as administrative expense under §§ 543 and 503); *In re Mid Region Petroleum, Inc.*, 1 F.3d 1130, 1132 (10th Cir. 1993) (general rule for administrative expense claims under § 503).

[7] Exh. PP-A.

[8] *Id.*

4

On September 13, 2010, the Texas judgment was filed in Douglas County, Kansas District Court, and on December 29, 2010, the Douglas County court heard the judgment creditor's motion for sale. An Order of Sale,[9] filed the following day, granted the motion and ordered that: (1) pursuant to K.S.A. 60-2140, the judgment creditor was permitted to sell as separate tracts real estate commonly known as Villa 26 Apartments and Four Wheel Drive by special execution at an auction to be conducted by BFC; (2) for its auction services, BFC would be compensated from the proceeds of the sale for the advertising and marketing expenses plus a 10% real estate commission; and (3) in order to preserve the properties and maximize their value, BFC was retained to manage Villa 26 Apartments and Four Wheel Drive, for which it "shall be paid 10% of the volume of income as a management fee." Copies of an Absolute Real Estate Auction Agreement[10] between Pratt and BFC (BFC-Pratt Auction Agreement) and a Commercial Property Management Agreement[11] between Pratt and BFC (BFC-Pratt Management Agreement) had been provided to the court with the motion for sale and were approved by the court. They were "fill in the blank" form contracts provided by BFC.

Debtor Rex Veech Youngquist filed this case pro se under Chapter 7 on January 25, 2011. J. Michael Morris was appointed as the Chapter 7 Trustee. Debtor's Schedule A, "Real Property," filed with his voluntary petition, listed the following Douglas County,

---

[9] Exh. 30.

[10] Exh. 29.

[11] Exh. 28.

Kansas properties, with the values as shown in parentheses: Villa 26 Apartments ($2,400,000); Four Wheel Drive ($700,000); and North Lawrence Real Estate ($170,000). On March 31, 2011, the Trustee filed his Application to Employ Property Manager/Realtor/Auctioneer (Trustee's Application to Employ),[12] seeking, among other things, the Court's approval of his retention of BFC as the manager of the three Douglas County properties. Copies of a proposed Commercial Property Management Agreement (BFC-Morris Management Agreement) and a proposed Absolute Real Estate Auction Agreement (BFC-Morris Auction Agreement) were attached to the motion. They utilized the same BFC form agreements that had been presented to the Douglas County, Kansas District Court, but with changes as discussed below. The application was granted by an Order to Employ Property Manager/Realtor/Auctioneer (Employment Order) filed on June 9, 2011.[13] It provides that as property manager, BFC "will receive management fees as set out in ¶ 12 in the Commercial Property Management Agreement attached to the Application to Employ filed on March 31, 2011." The Employment Order is silent as to its effective date.

On March 22, 2011, the Trustee filed a Complaint to Sell Jointly Owned Property, seeking authority to sell the estate's and Gail Youngquist's interests in Villa 26 Apartments under the authority of § 363(h).[14] That litigation was terminated by the entry

---

[12] Dkt. 46.

[13] Dkt. 79.

[14] Adv. no. 11-5073, dkt. 1.

6

of an order on September 24, 2012, allowing the sale of the jointly-owned property.[15]  On

November 6, 2012, the Trustee filed a motion to sell Villa 26 Apartments.[16]  The sale

occurred on December 13, 2012, with gross proceeds of $3,025,000,[17] and fees and

expenses due BFC of $289,727.50.[18]  This dispute about the management fees due BFC

arose shortly thereafter.

**BFC'S MANAGEMENT SERVICES.**

Villa 26 Apartments is a 76-unit apartment complex, comprised of nine buildings.

There are one-, two-, and three-bedroom units.  Each unit has parking or a garage, its own

appliances, and central air conditioning and heat.  There is no clubhouse or pool.  The

complex was constructed in approximately 1988 and has been owned by the Youngquist

family since that time.  The Youngquist family also managed the property until BFC was

engaged with the approval of the Douglas County, Kansas District Court.

Bill Fair and his wife, Kathy Fair, who operate BFC, testified at trial.  BFC's

primary business is auctioning, not management, except for short-term management of

properties to prepare them for sale.  When BFC was appointed by the Douglas County,

Kansas District Court, Bill Fair anticipated that the auction of Villa 26 Apartments and

Four Wheel Drive would be held within 60 to 90 days.  BFC undertook to clean up the

---

[15] Adv. no. 11-5073, dkt. 72.

[16] Dkt. 169.

[17] *See* dkt. 192.

[18] Dkt. 286.

Villa 26 Apartments property and seek tenants for vacant units. When the auction of Villa 26 Apartments was advertised, the occupancy was rate 98%. The rents collected by BFC for this property from January 1, 2011, through February 28, 2013, were $933,325.52, and the expenses, not including management fees, were $511,935.82.

The Four Wheel Drive property was valued at $700,000 in Debtor's schedules. That property includes a residence, additional rental units, and a separate office building. Debtor and Gail Youngquist, and perhaps other family members, lived in the residence at Four Wheel Drive during this bankruptcy. The Trustee directed BFC not to charge the Youngquists rent, which reduced the income from the property. The rents collected by BFC from January 1, 2011, through February 28, 2013, were $162,419.42, and the expenses, not including management fees, were $132,868.75. The Youngquists' occupancy of the Four Wheel Drive residence, although reducing required management services, compromised BFC's ability to efficiently manage the property. In addition, there was significant personal property belonging to various people, including the Youngquists and former tenants, stored at Four Wheel Drive which BFC had to deal with without the benefit of the Youngquists' historical knowledge and cooperation.

The North Lawrence Real Estate, valued at $170,000 in Debtor's schedules, required little management. It generated rental income of $36,300.80 from January 1, 2011, through February 28, 2013. For the same period, expenses, not including management fees, were $5,534.25, primarily for insurance and utilities.

The management authority granted to BFC by both the BFC-Pratt Management

8

Agreement and the BFC-Morris Management Agreement was extensive and identical. BFC, referred to as the "broker" in the agreements, was given authority to collect rents and other tenant charges and to pay from such collections "expenses to operate the Property, including but not limited to, maintenance, taxes, insurance, utilities, repairs, security, management fees, leasing fees, and expenses authorized under this agreement."[19] As to leasing, BFC was given authority to negotiate and execute leases on the owner's behalf at market rates, for initial terms of not less than one month or more than twelve months.[20]

**AGREEMENTS REGARDING BFC COMPENSATION**

The Order of Sale entered by the Douglas County, Kansas District Court approving BFC's retention for purposes of management and auction sale provides that BFC "shall be paid 10% of the volume of income as a management fee."[21] But the BFC-Pratt Management Agreement, approved in the Order of Sale, provides for additional compensation. The introductory portion of paragraph 12, titled "Broker's Fees," states, "If more than one property or unit is made part of and subject to this agreement, each of the provisions below will apply to each property or unit separately."[22] The paragraph then enumerates seven elements of compensation. The first element is "Management

---

[19] Exh. 28, ¶ 4(A)(1),(2), and (3); exh. 31, ¶ 4(A)(1),(2), and (3).

[20] Exh. 28, ¶ 4(B)(9); exh. 31, ¶ 4(B)(9).

[21] Exh. 30 at 2-3.

[22] Exh. 28 at 5.

9

Fees." As to each of the properties to which it applies,[23] this element provides, "Each month Owner [Peter Pratt - Receiver] will pay Broker [BFC] the greater of $4,000.00 (minimum management fee) or (1) 10% of the gross monthly rents collected that month." The second element is "Leasing Fees for New Tenancies" of 6% of the gross rents to be paid for each time the property is leased to a new tenant. The third element is "Renewal or Extension Fees" of 6% of the gross rents to be paid under the renewal or extension for each time a tenant renews or extends a lease, other than on a month-to-month basis. The fourth element is "Service Fees" of 10% of the total cost of each repair, maintenance, alteration, or redecoration which BFC arranges to be made to the property. The fifth element provides for BFC to retain all interest earned on any trust account it maintains under the agreement, the sixth element provides for BFC to retain all administrative fees, such as returned check and late fees, received from tenants, and the seventh element provides for BFC to be paid at the rate of $150 per hour for appearances at any legal proceedings, including tenant disputes.

When the bankruptcy was filed, Bill Fair was contacted by the Trustee and asked to continue his company's management services. The BFC-Morris Management Agreement utilizes the same form agreement as the BFC-Pratt Management Agreement, with changes requested by the Trustee and agreed to by Bill Fair on behalf of BFC. There were no in-person negotiations of the terms. Bill Fair sent a proposed signed agreement

---

[23] The description of the properties covered by the BFC-Pratt Management Agreement is handwritten and difficult to decipher. The Court assumes it covers all of Debtor's Douglas County properties.

10

to the Trustee, the Trustee made changes, signed the revised agreement, and returned the agreement to Bill Fair. Bill Fair did not contest any of the changes and agrees BFC is bound by the agreement as changed by the Trustee, the terms of which were approved by the Court. The BFC-Morris Management Agreement applies to three properties: Villa 26 Apartments, Four Wheel Drive, and the North Lawrence Real Estate.[24]

For purposes of this dispute, the important differences between the BFC-Pratt Management Agreement and the BFC-Morris Management Agreement are in paragraph 12 regarding the broker's fees. The provision in the agreement with Pratt that the broker fees would apply separately to each of the three properties under management was stricken, and the parties agreed that the management fee for all properties would be the greater of $7,000 per month or 10% of the gross rents collected that month. The management fee for new tenancies was changed to "one month's rent to be paid from first month's rent to be paid by tenant." The management fee based on lease renewals or extensions was changed to "one month's rent to be paid from the first month's rent paid by tenant after the renewal or extension." The service fees, the right to retain interest on trust accounts, and the fees related to legal proceedings were not changed, but the administrative fees were reduced to 50% of any administrative charges collected from

---

[24] The BFC-Morris Management Agreement, exh. 31, describes the property as four tracts, including, in addition to Villa 26 Apartments and Four Wheel Drive, the "Fish Farm" and "N. Lawrence." But BFC's accounts are for only three properties, Villa 26 Apartments, Four Wheel Drive, and North Lawrence Real Estate. Debtor's schedules list three Douglas County properties. The Trustee testified at the May 22, 2013 trial that the fish farm should not have been included in his agreements with BFC since he recently discovered that the fish farm had been conveyed, apparently prepetition. The Court will therefore interpret the BFC-Morris Management Agreement as applying to three tracts.

11

tenants.

**EXPERT TESTIMONY REGARDING FEES AND EXPENSES.**

At trial, Greg Hanson, employed by Weigand Omega Management, testified as BFC's expert witness as to fees and expenses for management of apartment complexes.[25] He testified that typical fees would vary greatly, ranging from 4% of rents for a very large, high-end project to 8 to 10% on a smaller project, usually with some minimum. There would not be an additional component of the management fees based upon lease renewals or repairs, unless there were a major rehabilitation. In addition to the management fees, property managers are customarily compensated for on-site expenses directly related to the property, such as pay for an on-site manager, credit checks on tenants, eviction expenses, on-site office expenses, and security expenses. Other expenses, such as supervision and bookkeeping, would be included in the management fees.

**THE TRUSTEE'S REQUEST FOR AN ACCOUNTING OF BFC'S FEES AND EXPENSES, AND BFC'S REQUEST FOR COMPENSATION.**

Throughout the period that BFC managed the estate's properties, BFC collected rents and other charges, and then paid expenses and its own compensation from the collected revenues. No money was distributed to Pratt before the bankruptcy case was filed or to the Trustee thereafter. The issue before the Court is to determine the

---

[25] Exh. 46.

management fees and expenses due BFC, deduct these and other funds due BFC[26] from the income collected, and determine the net amount to be paid to the estate.  Much of the trial testimony was therefore devoted to the review of accounting statements prepared by BFC.  During the first two days of trial, there were substantial challenges about the accuracy of the statements, but between the May and September trial dates, BFC prepared new statements of accounts, and the parties now agree that the numbers they contain are accurate.[27]  The details of those statements will be discussed below, and that discussion shall supplement these findings of fact.

Highly summarized, the Trustee seeks an accounting of the funds collected by BFC, and the fees and expenses properly owed to BFC through February 28, 2013.  BFC's position is that it is entitled to fees calculated in accord with the BFC-Pratt Management Agreement until June 8, 2011, and in accord with the BFC-Morris Management Agreement thereafter.  The Trustee's position is that some of the expenses for which BFC seeks compensation should be disallowed and that the allowed management fees should be reasonable fees, not those stated in the two management agreements.  In a post-trial brief, the Trustee submits five alternative approaches for determining BFC's allowable fees and expenses.[28]

The Court has previously granted the Trustee's request to approve the

---

[26] The amount owed to BFC under the BFC-Morris Auction Agreement was the subject of a separate order.  Dkt. 286.

[27] *See* exh. BF-J.

[28] Dkt. 284.

Case 11-10135    Doc# 303    Filed 12/06/13    Page 13 of 31

disbursement to BFC of $289,727.50 as the commission and expenses for sale of Villa 26 Apartments under the BFC-Morris Auction Agreement. Such payment is subject to adjustment based on any amount owed to the estate by BFC under the BFC-Morris Management Agreement.[29] This memorandum determines those fees and expenses through February 28, 2013.

**DISCUSSION.**

Under the facts of this case, an accounting of the management fees and expenses that are due to BFC involves a consideration of four discrete time periods: The prepetition period; the period between the filing of the bankruptcy and the filing of the Trustee's application for the appointment of BFC; the period during which the application was pending; and the period after the retention of BFC by the Trustee was approved. Each is considered below.

### A. Period I — December 30, 2010 (entry of Douglas County, Kansas District Court Order of Sale), to January 25, 2011 (date bankruptcy was filed).

Prepetition, BFC was a "custodian" as defined by § 101(11)(C),[30] which provides that the term means a "trustee, receiver, or agent under applicable law, or under contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors." Under the Douglas County, Kansas District Court Order of Sale, BFC was a custodian for Debtor's Douglas County

---

[29] *See* Dkt. 286.

[30] 11 U.S.C. § 101(11)(C). Future references in the text to Title 11 shall be to the section only.

14

properties, including Villa 26 Apartments and Four Wheel Drive. BFC was the agent of Peter Pratt, the receiver appointed by the Texas court, and was given charge over the properties for the purpose of enforcing the judgment lien arising from the filing of the Texas judgment against Debtor and his daughter in Douglas County, Kansas District Court.

Under § 543(b), when the bankruptcy was filed, BFC as custodian had a duty to account and to turn Villa 26 Apartments, Four Wheel Drive, and the North Lawrence Real Estate over to the Trustee, unless excused from such turnover under § 543(d). That subsection provides for a prepetition custodian to continue in possession, custody and control of property of the debtor if, after notice and hearing, it is determined to be in the best interests of creditors. Neither BFC nor the Trustee applied for BFC to continue as custodian. A prepetition custodian who does not remain in possession under § 543(d), such as BFC, is a superseded custodian. The compensation of a superseded custodian is governed by § 543(c)(2),[31] which provides that "[t]he court, after notice and a hearing, shall — . . . provide for payment of reasonable compensation for services rendered and costs and expenses incurred by such custodian."

Compensation for prepetition services of a superseded custodian is entitled to administrative priority under § 503(b)(3)(E).[32] It provides that after notice and a hearing,

---

[31] *E.g., In re Sevitski*, 161 B.R. 847, 854 (Bankr. N.D. Okl. 1993); *In re Brown and Sons, Inc.*, 498 B.R. 425, 434-35 (Bankr. D. Vt. 2013).

[32] 5 *Collier on Bankruptcy* ¶ 543.04 at 543-13 (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 16th ed. 2013).

there shall be allowed as administrative expenses, the "actual, necessary expenses . . . incurred by — . . . a custodian superseded under section 543 of this title, and compensation for the services of such custodian."  Commentators agree that § 503(b)(3)(E) grants administrative priority status to compensation for prepetition services.  One commentator states, "Custodians superseded under Code § 543 are entitled to administrative priority for both their actual and necessary expenses and compensation for their services.  This provision is an exception to the general rule that administrative expenses are not recoverable for prepetition claims."[33]  Another commentator states, "It is clear from the statutory language however, that the custodian's compensation is not limited to compensation for services rendered after the filing of the petition."[34]

The Court finds that BFC is entitled to reasonable compensation and reimbursement of expenses for the prepetition period.  The specifics of the determination of reasonable compensation under § 543(c)(2) are discussed in section D below.

### B.  Period II — January 25, 2011 (date bankruptcy was filed), to March 31, 2011 (date of filing of the Trustee's Application to Employ BFC).

A superseded custodian is also entitled to reasonable compensation under § 543(c)(2) for services rendered and costs and expenses incurred, and the priority provision of § 503(b)(3)(E) applies to a superseded custodian's postpetition "winding up"

---

[33] 3 William L. Norton, Jr., and William L. Norton III, *Norton Bankruptcy Law & Practice 3d*, § 49:42 at 49-225 (Thomson Reuters 2013).

[34] 4 *Collier on Bankruptcy* ¶ 503.10[6] at 503-83.

services and expenses.[35]  One of the unusual procedural circumstances of this case is that

at the Trustee's request and with his approval, BFC continued in possession of estate

property in the capacity of a custodian for several months after the date of filing.[36]

Although the time period during which BFC continued to act as a custodian was

significantly longer than that required for "winding up," the Court finds that § 543(c)(2)

governs the award of fees and expenses of BFC for this time period.

The specifics of the determination of reasonable compensation under § 543(c)(2)

are discussed in section D below.

### C.  Period III — March 31, 2011 (date of filing of the Trustee's Application to Employ BFC), to June 8, 2011 (day before the Employment Order).

The question with respect to the third period is whether the fees and expenses for

this period should be governed by the standards applicable before the Trustee's

application to appoint BFC was filed with this Court (examined above) or those

applicable after the order of appointment was filed (discussed below).  Neither the

Trustee's Application to Employ nor the Employment Order addresses the effective date

of the retention.

BFC argues that the Employment Order and the BFC-Morris Management

---

[35] 5 *Collier on Bankruptcy* ¶ 543.04 at 543-13.

[36] The petition was filed on January 25, 2011.  On that date, BFC became a superseded custodian. *Szwak v. Earwood (In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.)*, 592 F.3d 664, 670 (5th Cir. 2009).  A superseded custodian's wind-up duties are to preserve estate property, deliver estate property to the bankruptcy trustee, and to file an accounting.  11 U.S.C § 543(a).  The Trustee did not file an application for the appointment of BFC as a professional until March 15, 2011, and the employment order was not entered until June 9, 2011.

17

Agreement were not effective until June 9, 2011. BFC cites Federal Rule of Bankruptcy Procedure 9021, which provides, "A judgment or order is effective when entered." The Trustee does not challenge BFC's position that the BFC-Morris Management Agreement does not become a factor until the period commencing on June 9, 2011. The BFC-Morris Management Agreement supports this construction, as it states its primary term "begins and ends as follows: Commencement Date: Order to Employ Expiration Date: Closing."[37]

The Court finds that the BFC-Morris Management Agreement does not apply to the period between the filing of the Trustee's Application to Employ and the entry of the Employment Order. For this period, the standard for the award of fees and expenses is the reasonableness standard of § 543(c)(2), the specifics of which are discussed in section D immediately below.

**D. Amount of fees and expenses for Periods I, II, and III.**

BFC requests the allowance of management fees of $126,859.71 for the period from January 1, 2011, through June 8, 2011. BFC's accounting for this period itemizes "Brokerage Expense," or BFC's management fees, as follows:

| | |
|---|---|
| Retainer Fee | $ 80,000.00 |
| Management Fee | $ 40,000.00[38] |
| Expense 10% Fee | $ 4,149.71 |
| Admin. 50% Exp | $ 465.00 |

---

[37] Exh. 31 at 1.

[38] The management fee request appears to seek $4,000 per month for each of two properties, Villa 26 Apartments and Four Wheel Drive, but not to include a management fee for the North Lawrence Real Estate, even though it is a property included in the BFC-Pratt Management Agreement.

|                     |              |
|---------------------|--------------|
| Lease Extensions    | $   2,245.00 |
|                     | $126,859.71  |

These calculations are based upon the BFC-Pratt Management Agreement and the BFC-Pratt Auction Agreement, approved by the Douglas County, Kansas District Court.  As to expenses, BFC contends it is entitled to reimbursement of $115,128.59 for service costs, advertising and promotion, answering service, bank service charges, credit checks expense, environmental inspection, insurance, legal services (related to tenant matters), miscellaneous expense, office supplies, postage and delivery, security, survey expense, telephone expense, and utilities.  The Trustee contends the fees and expenses are not reasonable, and under the reasonableness standard, the fees should be 10% of the rents collected and the expenses should be as requested, except the auction-related expenses of environmental inspection and survey expense should be disallowed.

Based upon the foregoing discussion, the Court finds that it should allow BFC "reasonable compensation for services rendered and costs and expenses incurred" under § 543(c)(2) and § 503(b)(3)(E) for periods I, II, and III — from January 1, 2011, to June 8, 2011.  Although the parties do not contest the applicability of § 543(c)(2), they do disagree about its meaning and application.  BFC contends that reasonable compensation is determined by the terms of the BFC-Pratt Management Agreement.  BFC cites *In re 400 Madison Avenue*[39] in support.  The Trustee argues that the reasonableness standard should not be interpreted to incorporate the terms of the BFC-Pratt Management

---

[39] *In re 400 Madison Ave. Ltd. P'ship*, 213 B.R. 888, 898 (Bankr. S.D.N.Y. 1997).

19

Agreement, that the case relied upon by BFC does not apply, and that the Court should apply the standards for fee awards under § 330. The Court rejects both positions.

The Court agrees with the Trustee that the BFC-Pratt Management Agreement does not determine the fees and expenses that should be allowed. *400 Madison Avenue* does not support BFC's contention to the contrary. That case addresses the authority of a prepetition custodian who remained in that position after the bankruptcy filing under an agreement between the Chapter 11 debtor and a secured creditor to retain counsel and pay counsel's bill, subject only to a determination of reasonableness.[40] It does not address whether the custodian was entitled to the compensation provided for under a prepetition agreement. In the context of awarding attorney fees under § 330, the Tenth Circuit recently affirmed that the bankruptcy court "is not bound by the parties' compensation agreement."[41] A commentator states, "Compensation schedules set forth under the law by which the custodian was appointed will be relevant but not controlling."[42] The Court rejects BFC's position that its compensation should be governed by the BFC-Pratt Management Agreement. The Bankruptcy Code requires the Court to determine reasonableness, not to adopt the compensation standard approved by a state court.

However, the Court rejects the Trustee's argument that reasonable compensation under § 543(c)(2) should be construed to mean the adjusted lodestar approach adopted by

[40] *Id.*

[41] *Market Center East Retail Property, Inc., v. Lurie (In re Market Center East Retail Property, Inc.)*, 730 F.3d 1239, 1251 (10th Cir. 2013).

[42] 4 *Collier on Bankruptcy*, ¶ 503.10[6] at 503-83.

the Tenth Circuit to calculate professional fees under § 330(a)[43] for those appointed under § 327.  Section 330 does not apply directly, since at no time before June 9, 2011, was BFC appointed by this Court.  The Court also declines to adopt the § 330 standard by analogy.  The factors which must be applied under that approach are suitable for attorneys and other professionals, particularly where time records are maintained and the value of the services provided often bears a direct correlation to the time expended.  They are unsuitable for custodians, such as a property manager.

The standard for an award under § 543(c)(2), with priority as an administrative claim under § 503(b)(3)(E), is reasonableness.  Subsection 543(c)(2) expressly provides for the payment of "reasonable compensation."  A commentator states, "The determination of what qualifies as 'reasonable compensation' under section 543(c)(2) is a question of federal law, not state law, and is determined in accordance with bankruptcy law standards."[44]  Another commentator states the following about a reasonable fee for a custodian:

> The factors that are considered in determining whether a custodian's compensation is "reasonable" are similar to those used to determine if the compensation of an attorney or accountant under Code § 503(b)(4) is reasonable.  These factors include:  the time and labor expended by the custodian; the benefit of the custodian's services to the debtor and the estate; the size and/or complexity of the estate; what the custodian would have received if it had been appointed as trustee for the debtor, and the quality of the custodian's services.  The amount of compensation to which the custodian

---

[43] *See, e.g., Market Center East Retail Property*, 730 F.3d at 1249-50.

[44] 5 *Collier on Bankruptcy*, ¶ 534.04 at 543-13.

would have been entitled had there been no bankruptcy can serve as a guide to the court, but the court is nevertheless required to exercise independent judgment in the determination of the reasonableness of the compensation.[45]

As to the reasonableness standard in § 503(b)(3)(E), one commentator states:

> Nothing in section 503(b)(3)(E) sets forth a standard for awarding compensation for the custodian's services. Courts have generally looked to a reasonableness standard. Although the statute does not include the phrases "preservation of the estate" or "benefit to the estate," courts generally require a showing of benefit to the estate in awarding administrative expenses to a superseded custodian.[46]

There are no Tenth Circuit cases defining reasonableness for purposes of allowing fees and expenses to superseded custodians. After examining the authorities, the Court finds that the allowance of reasonable fees and expenses under § 543(c)(2), with priority under § 503(b)(3)(E), requires consideration of all the facts and circumstances of the case. In this case, the Court finds the relevant considerations to be: the services provided, the difficulty of the undertaking, the results obtained, the usual charges for such services if there had been no bankruptcy, and the benefit to the estate.[47]

The Court finds the requested management fees for the first five months of 2011 to be excessive and unreasonable. First, the requested allowance of an $80,000 retainer is denied. It is provided for in the BFC-Pratt Auction Agreement which states, "Owner

---

[45] 4 *Norton Bankr. Law & Prac. 3d*, § 62:13 at 62-40 to 62-41.

[46] 4 *Collier on Bankruptcy*, ¶ 503.10[6] at 503-83; *see also* 4 *Norton Bankr. Law & Prac. 3d*, § 62:13 at 62-40 to 62-41.

[47] *See Bodenheimer, Jones, Szwak, & Winchell*, 592 F.3d at 672-73 (holding that a benefit to the estate requirement is implied in § 503(b)(3)(E) and has historically been applied to services of prepetition liquidators and postpetition custodians).

[Pratt] agrees to pay a retainer of $80,000 for real estate marketing and Auction sale services, payable from rental income, which is fully earned regardless of whether the Property is sold."[48]  As stated above, the Court is not bound by any prepetition agreement between BFC and Pratt.  Further, the agreement on which BFC relies for the retainer addresses auction services, not management services.

Second, the Court will not allow the requested additional elements of the management fees — the $40,000 minimum management fee, the $4,149.71 fee based on 10% of renovation expenses that BFC authorized, the $465 administrative fee, and the $2,245 for lease renewals.  They are all based upon paragraph 12 of the BFC-Pratt Management Agreement.  It provides as to each managed property, "Each month Owner will pay Broker the greater of $4,000 (minimum management fee) or . . . 10% of the gross monthly rents collected that month."  The gross monthly rents for the Villa 26 Apartments and Four Wheel Drive properties for the period from January 1, 2011, to June 8, 2011, were $226,583.42, 10% of which is $22,658.34.  The fee requested for the period in issue is $40,000, which is the greater of the two items on which the fees are to be based under the agreement.  But, as explained above, when determining reasonable fees, the Court has rejected the BFC-Pratt Management Agreement as setting the standard for reasonableness.

What management fees are reasonable? Villa 26 Apartments had 76 units and its operation required continuous and significant management.  However, Four Wheel Drive

---

[48] Exh. 29.

was smaller and required less attention. BFC's duty was to preserve and protect the properties, and to maintain their value, not to generate income for the estate. The benefit to the estate of preserving Villa 26 Apartments as an operating rental property is obvious; Villa 26 Apartments sold for considerably more than predicted at the outset of the case. Other than complaints by Gail Youngquist, no questions have been raised about the quality of the management services provided by BFC to either Villa 26 Apartments or Four Wheel Drive. BFC has provided an accounting of its operations, which all the parties accept as an accurate report of the income and expenses. Despite the foregoing, the Court finds that the requested fees and expenses are not reasonable. Based upon the rents collected, the minimum fee of $4,000 per month, or a total of $20,000 for each property, is only slightly excessive for the services provided at Villa 26 Apartments, which generated rent of $197,808 during the five months, but far too large for the Four Wheel Drive property, where the rents collected were $28,623.50. The excessiveness of the requested fees is compounded by the request for an additional allowance of approximately $7,000 under the other elements of the payment terms of the agreement. BFC's expert testified that management fees for similar size properties are typically 8 to 10% of gross rents, without additional fees based upon other criteria. In this case, the Court finds that a management fee of $22,000 for the period from January 1, 2011, to June 8, 2011, which is approximately 10% of the gross rents, is reasonable and fully compensates BFC for the services it provided for the properties under management.

The Court finds that the expenses requested are reimbursable, with the exception

24

of the charges for an environmental inspection ($950.00), a survey expense ($10,068.40), and a miscellaneous expense ($82.50) for the sale of a vehicle. There is no question that the remaining expenses were necessary to the management of the properties and were actually incurred. The Court rejects the Trustee's challenge to the allowance of some expenses based on the contention that the expenses should be borne by BFC as part of the management services and not passed on to the property owner as separate expenses. The Court allows the charge for on-site maintenance of $13,595. This is the expense for an on-site manager assigned to Villa 26 Apartments and Four Wheel Drive, which the Court finds reasonable given the characteristics of the rental properties. The Court also allows the following expenses which the Trustee challenges: answering service ($792.84); bank service charges ($66.00); office supplies ($1,441.83); postage and delivery ($155.95); and telephone ($918.63). These are costs directly related to the operation of the two properties, not to BFC's general overhead.

The Court therefore allows BFC the following as administrative expenses for the period from January 1, 2011, to June 8, 2011: management fees of $22,000; and expense reimbursements of $104,027.69.

**E. Period IV — After June 9, 2011 (the date of the Employment Order).**

The Employment Order was entered under the authority of § 327(a), which provides that a trustee, with the Court's approval, may employ professional persons to assist the trustee in carrying out the trustee's duties. Section 330(a)(1) provides that after notice and hearing, and subject to §§ 326, 328, and 329, the Court may award to a

25

professional person employed under § 327 "reasonable compensation for actual,

necessary services rendered" and "reimbursement for actual, necessary expenses."

Compensation awarded under § 330 is granted administrative expense status under

§ 503(b)(2). Section 328(a), "Limitation on compensation of professional persons,"

provides:

> The trustee, . . . with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

Section 328 governs when prior court approval has been given to a certain compensation,

but subsequent events show the approved compensation was improvident; in that

situation, the reasonableness standard of § 330 does not apply.[49]

The question as to the fourth time period is whether the BFC-Morris Management

Agreement controls because it constitutes pre-approved compensation under § 328 or

whether the general standards of § 330 control. Three circuits, but not the Tenth Circuit,

have addressed the standard for determining whether a fee has been pre-approved under

§ 328. The Third Circuit holds that "'if the order does not expressly and unambiguously

---

[49] *Market Center East Retail Property*, 730 F.3d at 1245 n.5.

26

state specific terms and conditions (*e.g.* specific hourly rates or contingency fee arrangements) that are being approved pursuant to the first sentence of section 328(a), then the terms and conditions are merely those that apply in the absence of specific agreement.'"[50]  The Ninth Circuit holds that "unless a professional's retention application unambiguously specifies that it seeks approval under § 328, it is subject to review under § 330."[51]  Most recently, the Sixth Circuit found these formulations too constrictive and adopted the following standard:

> We hold that whether a court "pre-approves" a fee arrangement under § 328 should be judged by the totality of the circumstances, looking at both the application and the bankruptcy court's order.  Factors in the determination may include whether the debtor's motion for appointment specifically requested fee pre-approval, whether the court's order assessed the reasonableness of the fee, and whether either the order or the motion expressly invoked § 328.[52]

This Court likewise prefers the totality of the circumstances standard.  Under this standard, the bright-line criteria of the Third and Ninth Circuits are factors to be considered, but are not determinative.  The basic question is whether the Court when approving the employment also intended to approve the proposed terms and conditions, and to displace the § 330 reasonableness standard which would otherwise apply.  The totality of the circumstances, including the application, the order, and the services to be

---

[50] *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*. 50 F.3d 253, 261-62 (3rd Cir. 1995) (*quoting from and agreeing with In re C&P Auto Transport, Inc.*, 94 B.R. 682, 685 n. 4 (Bankr. E.D. Cal. 1988)).

[51] *In re Circle K Corp.*, 279 F.3d 669, 671 (9th Cir. 2002).

[52] *Nischwitz v. Miskovic (In re Airspect Air, Inc.)*, 385 F.3d 915, 922 (6th Cir. 2004).

provided, are relevant.

In this case, neither the application nor the order makes explicit reference to § 328. But the Trustee's Application to Employ BFC states that "[a]s property manager, Fair will receive management fees as set out in ¶ 12 in the attached Commercial Property Management Agreement."[53]  The Employment Order states, "As property manager, Fair will receive management fees as set out in ¶ 12 in the Commercial Property Management Agreement attached to the Application to Employ filed on March 31, 2011."[54]  By referencing the BFC-Morris Management Agreement, the Employment Order states the terms and conditions of the employment.  The professional being hired is a property manager, a category of professionals for whom the customary terms of compensation do not easily mesh with the standards of reasonable compensation under § 330.  The Court finds that the Employment Order approving the employment of BFC as property manager establishes a pre-approved fee arrangement within the meaning § 328.

For the period of time after June 9, 2011, the Court therefore allows BFC fees and expenses in accord with the BFC-Morris Management Agreement.  The management fees requested for the three properties for the period from June 9, 2011, through February 28, 2013, based upon paragraph 12 of the BFC-Morris Management Agreement, are comprised of the following elements:  Management fees of $147,000 (at the rate of $7,000 per month for all the properties); expenses fee of $23,769.04 (10% of

---

[53] Dkt. 46.

[54] Dkt. 79.

Case 11-10135    Doc# 303    Filed 12/06/13    Page 28 of 31

improvement expenses); administrative expenses of $7,215.75 (50% of tenant administrative charges); and lease extension fees of $82,883 (one month's rent on lease renewals).[55]  There is no dispute regarding the computation of these items.

Although the Trustee argues that the fees under the BFC-Morris Management Agreement are excessive, he provides no facts and no argument evidencing that the such terms and conditions have proven to have been improvident in light of developments not capable of being anticipated at the time he negotiated the terms of the agreement with BFC.  The Court therefore allows BFC management fees of $260,867.79 for the period from June 9, 2011, through February 28, 2013, as pre-approved fees under § 328.

BFC also requests the allowance of expenses for the same period in the amount of $547,017.62 for the three properties.[56]  The BFC-Morris Management Agreement provides that BFC may pay from collected rents and other charges "expenses to operate the Property, including but not limited to, maintenance, taxes, insurance, utilities, repairs, security, management fees, leasing fees, and expenses authorized under this agreement."[57] The Court holds that the expense allowance requested is granted, with the exception of $2,950.00 for an environmental inspection of Villa 26 Apartments, which is not an expense related to the management of the property.  For the same reasons as stated above

---

[55] Dkt. 232-1 at 4.  The request also includes $5,121.25 for "old security deposits refunded."  The Court has not awarded any fees for this item, since it is not included in paragraph 12 of the BFC-Morris Management Agreement.

[56] Dkt. 232-1 at 3.

[57] Exh. 31 at 2.

with respect to the period before the Employment Order, the Court rejects the Trustee's objection to the charges for the on-site manager ($62,820), answering service ($6,297.49), bank service charges ($1,880.32), office supplies ($2,471.92), postage and delivery ($53), and telephone ($3,299.41).

Therefore for the period from June 9, 2011, through February 28, 2013, the Court rules that BFC is allowed management fees of $260,867.79 and expenses of $544,067.62.

**CONCLUSION.**

The Court allows the following fees and expenses for BFC's services as a prepetition custodian, a superseded custodian, and a professional person employed pursuant to Court order: for the period from January 1, 2011, to June 8, 2011, management fees of $22,000 and expense reimbursement of $104,027.69; and for the period from June 9, 2011, through February 28, 2013, management fees of $260,867.79 and expense reimbursement of $544,067.62. Such fees and expenses are entitled to administrative expense priority under § 503(b)(2) and (3)(E). Given the Court's prior ruling that BFC is entitled to $289,727.50 for the sales commission and expenses for the sale of Villa 26 Apartments,[58] this ruling on the amount of management fees and expenses owed to BFC, and the accountings of BFC that reflect the amount of income from Debtor's properties that has been retained by BFC, which the parties now agree are accurate, the Court believes the parties will be able to agree on the net amount due to BFC or to the estate, as the case may be.

---

[58] *See* dkt. 286.

30

The foregoing constitutes Findings of Fact and Conclusions of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure which make Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter.

**Judgment is hereby entered** allowing Bill Fair & Co. the following compensation for services as a custodian and as a Court-appointed professional: for the period from January 1, 2011, to June 8, 2011, management fees of $22,000 and expense reimbursement of $104,027.69; and for the period from June 9, 2011, through February 28, 2013, management fees of $260,867.79 and expense reimbursement of $544,067.62. Such fees and expenses are entitled to administrative expense priority under § 503(b)(2) and (3)(E). The judgment based on this ruling will become effective when it is entered on the docket for this case, as provided by Federal Rule of Bankruptcy Procedure 9021.

**IT IS SO ORDERED.**

**# # #**

31